UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER LEE MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 11-cv-6153 |
| | ) | |
| v. | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Jennifer Moore, seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying her application for a period of disability, disability insurance benefits, and Supplemental Security Income Benefits ("disability benefits") under the Social Security Act ("The Act").[1] Ms. Moore has filed a motion for summary reversal, seeking to reverse the Commissioner's final decision or remand the case for consideration of the issues raised herein. For the reasons set forth below, Ms. Moore's Motion for Summary Reversal is denied [dkt. 15].

I.      **Procedural History**

Ms. Moore applied for DIB and SSI benefits on October 27, 2008, alleging that she became disabled on September 6, 2007.[2]   On July 2, 2009, Ms. Moore requested a hearing before an Administrative Law Judge ("ALJ"), which was granted on July 27, 2010.[3]   A hearing took place

---

[1] 42 U.S.C. §§416(I), 423, and 1381 *et seq.*
[2] R. at 139.
[3] R. at 99-112.

before ALJ Kathleen Muccerino in Orland Park, Illinois, on August 18, 2010.[4]  Following the hearing, the ALJ issued an unfavorable decision on October 22, 2010, concluding that Ms. Moore was not disabled under sections 216(I), 223(d) and 1614(a)(3)(A) of the Social Security Act.[5]  The Appeals Council denied Ms. Moore's request to review the ALJ decision on July 7, 2011, meaning the ALJ's decision is the final decision of the Commissioner.[6]

## II. Factual Background

The facts set forth under this section are derived from the administrative record.  Ms. Moore lists several ailments in her application for benefits, including: irritable bowel syndrome, a history of gastroparesis and Chrohn's disease, hypertension, hypothyroid, prolactin irregularities, carpal tunnel syndrome, foot problems, deep venous thrombosis, depression/anxiety, and back pain.  The ALJ determined that these ailments were non-severe because they presented no more than minimal limitations on her ability to work. But the ALJ found Ms. Moore's migraines, rheumatoid arthritis, asthma, and morbid obesity to be severe impairments. We will limit our review to these severe impairments.

### A. Migraines

Between May 2003 and July 2010 Ms. Moore went to six emergency rooms and was seen by seven physicians for treatment of her migraines. Because of the number of visits with different physicians, we will separate our analysis into the time before Ms. Moore's application and the time between Ms. Moore's filing for disability and the hearing.  We also highlight important notes in Ms. Moore's medical record.

---

[4] R. at 32.
[5] R. at. 12.
[6] R. at. 1.

### 1. Period Before Ms. Moore's Filing for Disability (Before October 21, 2008)

Though Ms. Moore was diagnosed with migraine headaches at age twelve,[7] her medical record for purposes of disability begins January 13, 2003, when she started treatment for her migraines with neurologist Bridgette Arnett, M.D.[8] Her initial visits indicate that prior to March 2003, she was typically experiencing headaches one time per month.[9] However, by May 2003 she had experienced a headache that had continued for at least four days and kept her from returning to work.[10]

Around that same time, in May 2003, Ms. Moore began seeing psychiatrist Thomas S. Bartuska, M.D.[11] Dr. Bartuska diagnosed Ms. Moore with depression and anxiety, chronic headaches, Chrohn's disease, and hypothyroid.[12]

Ms. Moore also began seeking treatment from emergency rooms to reduce her pain from migraines. Between March 22, 2005 and October 21, 2008, Ms. Moore entered the St. James Olympia Field Emergency room five times for migraine headaches, nausea, and vomiting.[13] During a visit on August 24, 2006 attending physician Lance Wallace, M.D. treated Ms. Moore for severe abdominal pain.[14] At this time Ms. Moore asked if her Dilaudid could be changed from subcut to IV.[15] (Dilaudid is a semi-synthetic opioid analgesic with effects similar to those of morphine but

---

[7] R. at 422.
[8] R. at 770.
[9] R. at 793.
[10] R. at 793-94.
[11] R. at 361.
[12] *Id.*
[13] R. at 438-906.
[14] R. at 906.
[15] *Id.*

five times more potent.)[16]  Because Dilaudid has a quick onset, it is a useful alternative to morphine.[17]  Dr. Wallace expressed to Ms. Moore that she would benefit from seeing a pain specialist because he was concerned about her becoming habituated to intravenous pain medications.[18] Dr. Wallace then spoke with Ms. Moore's primary doctor, Leonard Robinson, M.D., about this and Dr. Robinson concurred.[19]

Similarly, on November 16, 2006 Ms. Moore was admitted to the Flossmore Emergency Room complaining of a migraine.[20] Ms. Moore demanded Dilaudid for her headache but her treating nurse reported that Ms. Moore appeared comfortable and was walking around in no distress.[21]  Ms. Moore stated that she would rather go to the "ED" than sit in the Emergency room since she was not receiving Dilaudid.[22] Ms. Moore later called the nurse into her room to discuss her treatment plan, and requested morphine instead of Dilaudid.[23] Dr. Hayes told the attending nurse that Ms. Moore has a strong drug-seeking tendency and should not be given any narcotics.[24]  Ms. Moore reported that she would like to sign out since she was not getting her preferred migraine treatment.[25]

Around this time Ms. Moore returned to her neurologist, Dr. Arnett, where improvements of her headaches were noted, but then worsened again to three to four headaches per week.[26] By 2007, Dr. Arnett's notes indicate that Ms. Moore had lost her job and the stress of that worsened her

---

[16] Durnin, Colin, Ian D. Ding, Sajda P. Ghani, David B. Yates, and J. Gegg. "Pharmacokinetics of Oral Immediate-Release Hydromorphone (Dilaudid ® IR) in Male and Female Subjects." Proc. West. Pharmacol. Soc. 44 (2001): 77-78. Web.
[17] *Id.*
[18] R. at 906.
[19] *Id.*
[20] R. at 886.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] R. at 785.

headaches.[27]

In 2007 Ms. Moore also enrolled in a migraine study at the University of Illinois at Chicago. There, to reduce Ms. Moore's migraine pains, Konstantin Slavin, M.D., placed an occipital nerve stimulation generator in Ms. Moore's right infraclacivular region.[28] Dr. Slavin noted that he expected Ms. Moore to "continue to enjoy the benefits of stimulation particularly the relief of her chronic migraine headaches."[29] He also stated that if Ms. Moore started to have new problems or lost benefits from this stimulation that she should come back and seek additional treatment with him, but he was overall very happy with Ms. Moore's outcome.[30]

However, Ms. Moore still experienced great pain from her migraines. By April 12, 2007, Dr. Bartuska experienced a similar concern over Ms. Moore's desire for pain medication.[31] This was related to Barbara Moore, Jennifer Moore's mother, having paged Dr. Bartuska's office stating, "we think after talking to our daughter's therapist, that she is addicted to narcotics" for her migraines.[32]

Ms. Moore sought treatment from the Palos Community Hospital Emergency room for headaches, nausea, and vomiting three times between September 20, 2007 and May 18, 2008.[33] During Ms. Moore's visit on September 20, 2007 Ms. Moore told Brian Crowley D.O., who was treating her, that her physicians told her to go to a local community hospital to receive Dilaudid for her headaches.[34] At this time, there was a long discussion with Ms. Moore concerning narcotic use with headaches.[35]

---

[27] R. at 775.
[28] R. at 381.
[29] *Id.*
[30] R. at 381-2.
[31] R. at 361.
[32] R. at 658.
[33] R. at 839-44.
[34] R. at 844.
[35] *Id.*

On March 10, 2008, Ms. Moore returned to her primary doctor, Dr. Robinson, to discuss pain management. Dr. Robinson noted that he asked her mother, Barbara Moore, to also be present at this visit because of the "growing concern" that Ms. Moore was frequently seeking narcotics, which might be leading to a problem.[36] Dr. Robinson continued Ms. Moore on her current medications and recommended that Ms. Moore see a pain specialist, Rajive Adlaka, M.D., to help Moore manage her pain and get Ms. Moore seeing one doctor and using one pharmacist.[37]

Several months later, Dr. Arnett noted that Ms. Moore was thought to be drug seeking from other physicians, and her recommendation was for Ms. Moore to continue receiving treatment from the University of Illinois Medical Center at Chicago where she was a part of the brain stimulation study.[38] Dr. Arnett admitted that she was inadequately treating Moore's very serious headaches and at this time discharged Ms. Moore from her care.[39]

Ms. Moore then returned to Dr. Robinson on July 7, 2008 for a checkup.[40] Dr. Robinson noted during this examination that Ms. Moore "has been in and out of the emergency room quite a bit since the last time" he saw her and that "[s]he is actually asking for a Porte so that she can get better IV access."[41] Dr. Robinson again referred Ms. Moore to a pain specialist and also recommended she see a psychologist.[42]

### 2. Period Between Moore's Disability Filing and Hearing (Between October 21, 2008 and July 7, 2010)

---

[36] R. at 332.
[37] Id.
[38] R. at 772.
[39] R. at 772.
[40] R. at 911.
[41] Id.
[42] Id.

On October 24, 2008 neurologist Daniel Hier, M.D. from the University of Illinois wrote a letter stating Ms. Moore was under his care for disabling headaches.[43]  Dr. Hier stated that Ms. Moore was troubled with "continuous unremitting headaches" and was disabled from working.[44]

On February 12, 2009 Ms. Moore saw M.S. Patil, M.D., for an examination that was solely for the purpose of providing information to the Bureau of Disability Determination.[45]  Ms. Moore's neurological examinations were essentially negative.[46]  At this examination, Ms. Moore stated to Dr. Patil that the neurostimulator implantation at the back of her scalp helped her to some extent.[47]

During this time, Ms. Moore continued to go to the emergency room to treat her migraine pain. On March 28, 2009, Ms. Moore entered the St. James Emergency Room for treatment of a migraine.[48]  After receiving medication, Ms. Moore became upset that she was not given Dilaudid.[49]  Ms. Moore stated that after she was discharged she was going to sign back in for pain control.[50]

Lastly, on October 5, 2009, Ms. Moore completed a Function Report for the Social Security Administration in which she was asked information about her daily activities.[51]  Ms. Moore stated that she is able to take care of her cat, feed her cat, and change her liter.[52]  Ms. Moore indicated that she prepares her meals, and does laundry and some ironing.[53]  Ms. Moore stated that she goes shopping once or twice a week, but her migraines keep her in the house.[54]  Ms. Moore also stated

---

[43] R. at 358.
[44] *Id.*
[45] R. at 422.
[46] R. at 425.
[47] *Id.*
[48] R. at 566.
[49] *Id.*
[50] *Id.*
[51] R. at 255.
[52] R. at 256.
[53] R. at 257.
[54] R. at 256-8.

that she spends a few times during the week in person, on the phone, and on the Internet with others, but does not see friends as much as she used to since her conditions began.[55]

### B.    Rheumatoid Arthritis

The record contains notes from treating physicians that state Ms. Moore complained of rheumatoid arthritis and these notes range from November 2003 to March 2008. But there are no medical records to support this diagnosis or how this condition affected her daily activities. In fact, the only medical records concerning Ms. Moore's alleged rheumatoid arthritis are from her examination with Dr. Patil on February 12, 2009. During this examination Ms. Moore complained of constant mild pain and stiffness in her hands, back and knees for the past ten years.[56] Dr. Patil noted no deformity, swelling, tenderness or redness of any joint.[57] He did not see a shortening of extremities or atrophy of extremity muscles.[58] Ms. Moore's circulation and sensation were within normal limits.[59] Dr. Patil also noted that there were no definite trigger points.[60]

### C.    Asthma

Ms. Moore also alleged the severe impairment of asthma, but similar to her rheumatoid arthritis claim, the medical record pertaining to Ms. Moore's asthma claim is limited. There includes one visit to South Suburban Hospital on October 20, 2003, in which Ms. Moore was complaining of shortness of breath.[61] The admitting diagnosis was asthma and Ms. Moore's asthma was later reportedly resolved.[62]

---

[55] R. at 260.
[56] R. at 422.
[57] R. at 425.
[58] *Id*.
[59] R. at 424.
[60] R. at 425
[61] R. at 739.
[62] *Id*.

Six years later, on February 12, 2009 at Ms. Moore's examination with Dr. Patil, she stated that she had been suffering from asthma since age sixteen and had trouble with her breathing when the weather would change.[63]  Ms. Moore did not complain of wheezing, chronic cough, shortness of breath, hemoptysis, chills, or fever.[64] She stated that her inhaler keeps her asthma under control.[65]

### D.    Obesity

Ms. Moore's medical records from check-ups and emergency room visits document her weight as ranging from 285 pounds to 311 pounds.  There is no documented medical evidence as to how Ms. Moore's weight affects her daily activities.  The few medical records that document Ms. Moore's weight are as follows.

During Ms. Moore's examination with Dr. Patil on February 12, 2009, he noted that she suffers from extreme obesity.[66] On this date, she weighed 288 pounds and had a BMI of 48.[67] On February 17, 2009 state agency medical consultant Calixto Aquino, M.D. performed a physical residual functional capacity assessment of Ms. Moore.[68] Dr. Aquino noted that Ms. Moore had a BMI of 48 but had very mild difficulty with tandem walking, heel-toe walking, and squatting.[69]

---

[63] R. at 422.
[64] *Id.*
[65] *Id.*
[66] R. at 426.
[67] *Id.*
[68] R. at 434.
[69] *Id.*

### III.    ALJ Hearing and Decision

The hearing before the ALJ occurred on August 18, 2010 in Chicago, Illinois.[70] Ms. Moore was present, as were her mother, Barbara Moore, and a vocational expert, Edward Steffan ("VE").[71] Carl Moore, Ms. Moore's father, also accompanied her.[72] On October 22, 2010, the ALJ concluded that Ms. Moore was not disabled within the meaning of the Act.

### 1.    Ms. Moore's testimony

Ms. Moore began her testimony by affirming that she had completed college with a degree in Marketing and a focus in Public Relations.[73]  After college, Ms. Moore began working for Southwest Airlines as a reservation agent.[74]  Ms. Moore testified that she continued to work for Southwest Airlines for seven years.[75]  Ms. Moore stated that this job began as a full time position but changed, through her decision, to part time due to her medical ailments.[76]  Ms. Moore claims to have been fired from Southwest Airlines on September 6, 2007, on account of too many medical leaves.[77]  Ms. Moore previously worked as a part-time Clinique cosmetics clerk between 1992 and 1997.[78]  Ms. Moore testified to looking for work in department stores and specialty shops since her termination from Southwest Airlines, but has not received any interviews.[79]

In terms of her life outside of work, Moore testified that she lives in a house with her parents and has never lived alone.[80]  Ms. Moore stated that she rarely uses a computer due to pain and

---

[70] R. at 34.
[71] *Id.*
[72] R. at 35.
[73] R. at 39.
[74] *Id.*
[75] R. at 40.
[76] *Id.*
[77] *Id.*
[78] R. at 38.
[79] R. at 52-4.
[80] R. at 38.

numbness in her hands.[81]  She testified that she was advised not to lift anything heavy, but could lift

up to ten pounds.[82]  Ms. Moore did not state during her testimony who advised her not to lift

anything heavy. Ms. Moore stated that she enjoyed watching television such as soap operas, talk

shows, and reality TV.[83]

In terms of Ms. Moore's health, she testified that severe migraines prevent her from

working.[84]  Ms. Moore reported "[h]eadache, nausea, the vomiting, can't stand light or sound," when

these migraines are present.[85]  She also testified that her "sense of smell is heightened which

aggravated the nausea and the headache."[86]  Ms. Moore testified that these symptoms have gotten

worse over time.[87]  Ms. Moore stated that she received an implant in February 2007, which she

testified helped her pains but "it doesn't totally get rid of the headache."[88]  In terms of medication

for her migraines, Ms. Moore testified that she takes Neurontin, Ralpax, and Furoset.[89]  She also

testified to going to physical therapy and to a chiropractor but can no longer afford to seek treatment

from the chiropractor.[90]  Ms. Moore stated that she used to frequent St. James hospital for her

migraines but testified that she similarly can no longer afford such visits.[91]

Additionally, Ms. Moore testified to have suffered from depression, anxiety, rheumatoid

arthritis, carpel tunnel, irritable bowel, and hypothyroid.[92]  To treat her anxiety, Ms. Moore testified

---

[81] R. at 53.
[82] *Id.*
[83] R. at 54.
[84] R. at 4.
[85] *Id.*
[86] *Id.*
[87] R. at 42.
[88] *Id.*
[89] R. at 43-4.
[90] R. at 44.
[91] R. at 46.
[92] R. at 43.

that she takes Xclonazepan.[93] She claimed that this medication helps but she still experiences "anxiety attacks but not frequent."[94] For her depression, Ms. Moore testified that she takes Lexapro and sees a psychologist and psychiatrist.[95] To treat Ms. Moore's rheumatoid arthritis and carpel tunnel, she stated that she takes Prednisone and Extra Strength Vicodin.[96] For Ms. Moore's irritable bowel syndrom she testified that she was given Reglan and HyoMax but still experienced stomach spasms and diarrhea.[97] To treat her hypothyroid, Ms. Moore testified that she takes Sythroid, which she stated helped relieve all symptoms.[98]

### 2.    Mother's Testimony

Next, Ms. Spector interviewed Barbara Moore, Jennifer Moore's mother.[99] When asked about her migraine episodes, her mother testified that her last one lasted about forty-eight hours and she was only able to lay around.[100] During these periods, according to her mother, she is unable to do a variety of activities, such as watch television, drive, cook, or pick up after herself.[101] Due to these migraines, she also testified that Ms. Moore rarely leaves her home and no longer sees friends or participates in regular activities such as church or organizations.[102]

Barbara Moore next testified that she and her husband would often take Ms. Moore to the emergency room for migraine treatment.[103] She testified that she and her husband stopped taking Ms. Moore to the hospital to avoid medical bills and began relying on home remedies to relieve

---

[93] R. at 44.
[94] *Id.*
[95] R. 44-5.
[96] R. at 45.
[97] R. 49-51.
[98] R. at 52.
[99] R. at 55.
[100] R. at 58.
[101] *Id.*
[102] R. at 59.
[103] R. at 63.

migraine pains.[104] In terms of Ms. Moore's lifestyle, her mother stated that she and her husband had

a difficult time getting their daughter out of the house and that Ms. Moore does not have a social

life.[105] She also testified that her daughter's neurosurgeon and neurologist assured her that Ms.

Moore was not addicted to medication.[106]

### 3.      VE's Testimony

Lastly, the VE testified.[107] The ALJ asked the VE a series of hypotheticals. The last

hypothetical provided for an individual with the same age, educational background, and work

experience as Ms. Moore, and who is limited to an exertional level of sedentary and must avoid

concentrated exposure to extreme cold and extreme heat, noise, fumes, odors, dust, gases, poor

ventilation, hazards like machinery and heights, and who will miss work one to two times a week

due to pains from migraines.[108] When asked if that individual could perform any of Ms. Moore's past

work the VE testified that there was not any work in the economy that this hypothetical individual

could do.[109] The VE's reasoning for this opinion was the "[t]he individual must be available to work.

They can't miss one or two days a week and remain employed."[110]

### 4.      ALJ's Decision

In an opinion issued on October 22, 2010, the ALJ concluded that Ms. Moore was not

disabled within the meaning of the Act, both in terms of a period of disability and disability

insurance benefits, and supplemental income, at any time after her alleged onset date of September

---

[104] R. at 62-3.
[105] R. at 64.
[106] *Id.*
[107] R. at 69.
[108] R. at 70-1.
[109] R. at 72.
[110] *Id.*

6, 2007.[111]  Although, the ALJ found that Ms. Moore met the insured status requirements of the Act, she opined that Ms. Moore did not establish that she was unable to perform her past relevant work as a reservation agent.[112]

SSA regulations prescribe a sequential five-part test for ALJs to use in determining whether a claimant is disabled.[113] The ALJs first step is to consider whether the claimant is presently engaged in any substantial gainful activity, which would preclude a disability finding.[114]  In the present case, the ALJ determined that Ms. Moore had not engaged in substantial gainful activity since September 6, 2007, the alleged onset date.[115]

The second step is for the ALJ to consider whether the claimant has a severe impairment or combination of impairments.[116]  In the present case, the ALJ concluded that Ms. Moore had the medically determinable severe impairments of migraine headaches, asthma, morbid obesity, and rheumatoid arthritis.[117]  She also found that Ms. Moore had non-severe impairments, namely irritable bowel syndrome, gastroesophageal reflect disease, hypertension, hypothyroid, prolactin irregularities, carpal tunnel syndrome, foot ailments, deep venous thrombosis, depression, and anxiety.[118]

The ALJ's third step is to consider whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity.[119]  In the present case, the ALJ determined that Ms. Moore's impairments did not meet or medically equal a

---

[111] R. at 25.
[112] R. at 24.
[113] R. at 16.
[114] *Id.*
[115] R. at 17.
[116] R. at 16.
[117] R. at 17.
[118] R. at 17-8.
[119] R. at 16.

listed impairment under 20 CFR Part 404, Subpart P, Appendix 1.[120]  In reaching this decision, she factored in the effects of obesity pursuant to SSR 02-01p.[121]  She noted that she considered listing 3.03 for asthma; however, the claimant lacked either the pulmonary function findings or the requisite number of medical interventions for an uncontrolled exacerbation.[122]  She reasoned that because of the absence of a migraine listing or comparable listing, she considered this impairment and its effects in later steps.[123]

In the event that no impairments are found to meet SSR listing requirements, the ALJ proceeds to the fourth step of the test, which is to determine whether the claimant is able to perform her past work.[124]  This involves evaluating the claimant's RFC based on the record and her testimony and comparing it to the requirements of her past work.[125]  The RFC is an assessment of the maximum work-related activities a claimant can perform despite her limitations.[126]  If determining the claimant's RFC requires the ALJ to assess subjective complaints, then she follows a two-step process.[127]  First, she determines whether there is an underlying medically determinable impairment, determinable by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the claimant's symptoms.[128]  If so, the ALJ then evaluates the intensity, persistence, and limiting effects of a claimant's symptoms on his ability to do basic work activities.[129]  When making determinations about the credibility of the claimant's subjective

---

[120] R. at 20.
[121] *Id.*
[122] *Id.*
[123] *Id.*
[124] R. at 17.
[125] *Id.*
[126] *Young v. Barnhart*, 362 F.3d 995, 1000-1001 (7th Cir.2004), *citing Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir.2001); 20 C.F.R. §404.1545(a)(1).
[127] R. at 20.
[128] *Id.*
[129] *Id.*

complaints, the ALJ must consider the entire record.[130]  The ALJ need only consider the subjective symptoms to the extent that they can reasonably be accepted as consistent with the objective medical evidence and other evidence.[131]  If, after this process, the ALJ determines that the claimant's RFC makes her able to perform her past work, she is found not to be disabled.[132]

Here, the ALJ decided that Ms. Moore had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 4040.1567(a) and 416.967(a) except she must avoid concentrated exposure to extreme cold, extreme heat, noise, fumes, odors, dusts, gases, poor ventilation (all related to her asthma),[133] hazardous machinery, and heights.[134]  In terms of Ms. Moore's subjective complaints, the ALJ found that while her medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements regarding intensity, persistence, and limiting effects of these symptoms were not credible.[135]

In her credibility determination, the ALJ pointed to inconsistent statements concerning Ms. Moore's medication seeking and the lack of evidence to support her excessive sick leave.[136]  She found that Ms. Moore's doctors, pharmacy, and emergency room physicians questioned Ms. Moore's emergency room visits as problematic or drug seeking.[137]  Additionally, she noted that Ms. Moore's parents observed her behavior "as potential addiction to narcotic pain medication."[138]

The ALJ also noted that Ms. Moore's allegations of rheumatoid arthritis and manipulative

---

[130] *Id.*
[131] *Id.*
[132] *Id.*
[133] R. at 22.
[134] R. at 20.
[135] R. at 21.
[136] *Id.*
[137] *Id.*
[138] R. at 22.

limitations were not supported by the medical findings.[139] The ALJ noted that Ms. Moore's rheumatologist, Dr. Serushan, did not document or measure functional effects in Ms. Moore's joints.[140] The ALJ also mentioned that the consultative examination revealed no edema, and found Ms. Moore to have full strength in all extremities with no limitation of fine or gross manipulative movements of the hands or fingers.[141]

Next, the ALJ discredited Ms. Moore's subjective complaints of extreme limitation of daily activities.[142] She pointed to two factors that weighed against Ms. Moore's testimony: first, Ms. Moore's allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty; second, it was difficult to attribute the degree of limitation to Ms. Moore's medical condition, as opposed to other reasons.[143] She noted that this was due to relatively weak medical evidence.[144]

The ALJ considered the vocational issues relevant to Ms. Moore's credibility.[145] She noted a discrepancy between Ms. Moore's testimony and the record.[146] Ms. Moore stated that she was fired due to excessive sick leave but reported to Dr. Bartuska that she lost her job solely for checking emails while at work and that the union was appealing her discharge.[147] Additionally, no evidence was provided that demonstrated excessive sick leave had any bearing on Ms. Moore's discharge.[148]

In considering the opinion of the treating neurologist, Dr. Hier, the ALJ did not give his

---

[139] *Id.*
[140] *Id.*
[141] *Id.*
[142] R. at 23.
[143] *Id.*
[144] *Id.*
[145] *Id.*
[146] *Id.*
[147] *Id.*
[148] *Id.*

opinion controlling weight or special significance.[149]  She noted that Dr. Hier did not offer a specific restriction in limitation of activities but simply concluded that Ms. Moore was disabled.[150]

The ALJ gave significant weight to the State agency medical consultant, Dr. Aquino.[151]  She noted that Dr. Aquino found the claimant to be capable of light work.[152]  She found his opinion both internally supported and consistent with the record.[153]

Next, the ALJ considered the testimony of Ms. Moore's mother, though she did not fully credit it.[154]  She found that her testimony supported Ms. Moore's drug seeking, her daughter's bad migraines decreased when she stopped going to the emergency room, and that Ms. Moore had about five or six headaches in the past six months.[155]

Lastly, the ALJ determined that Ms. Moore was capable of performing past relevant work as a reservation agent.[156]  She noted that this past relevant work was performed at the semi skilled sedentary work level.[157]  In comparing Ms. Moore's RFC with the physical and mental demands of this work, she determined that Ms. Moore was able to perform this work as it is actually and generally performed.[158]

## III.    Standard of Review

The Court must sustain the Commissioner's findings of fact if they are supported by substantial evidence and are free of legal error.[159]  Substantial evidence is relevant evidence that a

---

[149] *Id.*
[150] R. at 24.
[151] *Id.*
[152] *Id.*
[153] *Id.*
[154] *Id.*
[155] *Id.*
[156] *Id.*
[157] *Id.*
[158] *Id.*
[159] 42 U.S.C § 405(g).

reasonable mind might accept as adequate to support a conclusion.[160] The standard of review is deferential, but the reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision.[161] Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner and not the Court.[162] Although the ALJ need not address every piece of evidence or testimony presented, he must adequately discuss the issues and build an accurate and logical bridge from the evidence to the conclusion.[163] The Court will conduct a critical review of the evidence and will not uphold the ALJ's decision if it lacks evidentiary support or an adequate discussion of the issues.[164]

## IV.    Analysis

Ms. Moore proffers two principal arguments for remand. First, Ms. Moore claims the ALJ's credibility analysis was patently wrong because despite the alleged drug-seeking behavior, none of her treating doctors doubted the severity or frequency of her headaches. Second, Ms. Moore argues that the ALJ's RFC assessment was insufficient because the ALJ failed to account for any limitations stemming from her chronic migraines.

These two arguments are inevitably intertwined. But we begin with credibility, as the RFC so heavily relies on the testimony and evidence the ALJ credited. In assessing credibility, SSR 96-7p states that the ALJ's written decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's

---

[160] *McKenzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)
[161] *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).
[162] *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990)(quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).
[163] *Jones v. Astrue*, 623 F.3d 1155, 1160 (7 th Cir. 2010), *McKinzey*, 641 F.3d at 889.
[164] *Clifford v. Apfel*, 227 F.3d 863, 839 (7th Cir. 2000).

statements and the reasons for that weight."[165] The ALJ need not address every piece of evidence or testimony presented, but rather must provide a "logical bridge" between the evidence and the ALJ's conclusions.[166] While the ALJ's credibility assessment and ultimate determination need not be perfect, it must not be "patently wrong."[167] As the reviewing court, we give the ALJ's determination "special deference,"[168] because "the ALJ is in the best position to see and hear the witness and determine credibility."[169]

Ms. Moore argues that the ALJ was wrong to discredit her for alleged drug-seeking behavior, because even assuming that were true, no treating doctor doubted the severity of her headaches. And even the ALJ herself acknowledged the frequency of her headaches, stating that her migraines "occur once to twice weekly now."[170]

But there is sufficient evidence in the record to support the ALJ's determination that Ms. Moore's "credibility about her pain and limitations was compromised by her drug-seeking behavior."[171] The ALJ referenced the physicians who questioned her visits as problematic or drug-seeking.[172] The ALJ also specifically noted medical records from 2006 and 2008 where "strong drug seeking tendency" was indicated.[173] Then the ALJ referred to Ms. Moore's parents' concern of the same, and Ms. Moore's failure to follow-up with a pain management specialist, per her primary care doctor's referral.[174]

---

[165] SSR 96-7p, 1996 WL 374186, at 2; *see* also *Brindisi ex. Rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7 th Cir.2003).
[166] *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir.2010).
[167] *Id*. at 1162.
[168] *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir.2010).
[169] *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.2000).
[170] R. at 23.
[171] *See Poppa v. Astrue,* 569 F.3d 1167, 1172 (10th Cir. 2009).
[172] R. at 21.
[173] R. at 21.
[174] R. at 22.

Here, the ALJ was discounting Ms. Moore's credibility not because she believed Ms. Moore was not in any pain but, rather, because she seemed "all to eager to take [her] narcotic pain medication," which she had been cautioned against overusing, and was apparently uninterested in following up with a pain specialist.[175] Multiple records show her treating physicians and apparently some pharmacists noted concern over her drug-seeking tendencies.[176] And between 2007 and 2009 alone Ms. Moore went to emergency rooms multiple times for her migraine headaches, sometimes only days after her previous visits, with a history of being told that there was concern over her use of narcotics.[177] There is also evidence that Ms. Moore may have had her "own idea of what type of treatment [she] needed,"[178] because records show that Ms. Moore would request Dilaudid and IV access during her emergency room visits.[179]

It is certainly possible, as Ms. Moore argues, that she was drug-seeking only to relieve extreme pain. But the ALJ addressed this when she referenced a record entry where Ms. Moore demanded Dilauded, yet appeared comfortable and walking around in no distress.[180] And perhaps more important, the ALJ did not "singularly discount her credibility" because of her noncompliance (referring to cancelled appointments with her treating neurologist) and drug-seeking behavior.[181] The ALJ also noted the relatively weak medical evidence supporting her claims of extreme

---

[175] *See Simila v. Astrue*, 573 F.3d 503, 520 (7th Cir.2009)(finding claimant was eager to take narcotics and was unwilling to participate in physical therapy, which was prescribed); *see also* R. at 22.

[176] R. at 911, 916, 772.

[177] R. at 844-45 (noting in 2007 a discussion with patient concerning narcotic use), 847 (noting use of Dilaudid), 839 (noting use of Dilaudid), 514, 521 (noting use of Dilaudid per patient's request), 523, 532, 544, 4,38, 449, 826, 830.

[178] *See Simila*, 573 F.3d at 519 (stating that claimant's insistence on a particular treatment shows a pattern of drug-seeking).

[179] R. at 906 (requesting that her Dilaudid be changed from subcut to IV), 470 (noting patient's decision to go home if she could not receive more Dilaudid), 888 (choosing to "sign out" because patient did not get her preferred migraine treatment).

[180] R. at 21.

[181] R. at 22.

limitations; that there was no evidence of deterioration in her medical condition since the time she

worked; and

her inconsistent statements regarding why she stopped working.[182] For example, Ms. Moore testified

that she stopped working due to excessive sick leave and viewing an email when she was not

supposed to; however, as the ALJ noted, she reported to Dr. Bartuska that she lost her job solely for

checking emails at work and that the union was appealing her discharge.[183] Ms. Moore also testified

to missing two to three times a month because of migraine pain or digestive problems, but there were

no employment records to corroborate that claim.[184]

Because an ALJ's credibility assessment will stand "as long as [there is] some support in the

record" and is not "patently wrong,"[185] we will uphold the ALJ's conclusion as to credibility. When

assessing credibility the ALJ is required to make a judgement call that encompasses all relevant

factors, which we find has been done here.[186]

We now move to the ALJ's RFC finding, which involves "what an individual can still do

despite his or her limitations."[187] An RFC is based on ability to function on a regular basis, meaning

roughly eight hours a day for five days a week.[188] Here, the ALJ concluded that Ms. Moore had the

ability to perform sedentary work but, Ms. Moore argues, that conclusion did not factor in any

limitations from her chronic migraines. Yet, she argues that because the ALJ found her migraines

to be a severe impairment, such a finding alone means they constitute an impairment that

---

[182] R. at 23(finding that though she testified that she stopped working due to excessive sick leave and viewing email, she had reported to her doctor that she lost her job solely because she checked her email).
[183] R. at 23.
[184] R. at 55-6; *see also Herrera v. Astrue,* 893 F.Supp.2d 933, 944 (N.D. Ill. 2012)(noting that an ALJ may rely on lack of objective evidence to discount a complaint).
[185] *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007).
[186] *See Kellems v. Astrue,* 382 Fed.Appx. 512, 516 (7th Cir. 2010).
[187] S.S.R. 96-8p.
[188] *Pepper v. Colvin,* ---F.3d---, 2013 WL 1338123, *9 (7th Cir. 2013).

"significantly limits" her ability to do basic work activities.[189]

Though the guidelines for evaluating a disability state that a severe impairment "significantly limits [a person's] physical or mental ability to do basic work activities,"[190] simply having a severe impairment is not determinative of whether limitations exist. In fact, a severe limitation does not necessarily require any limitations.[191]

Nonetheless, it is true that the ALJ seemed to accept the frequency of her headaches, stating that her migraines "occur once to twice weekly now."[192] Then she noted that "even if they did occur at the frequency and severity attested she still has a significant amount of time during which she would not be incapacitated."[193] The problem is, the "severity attested" to by Ms. Moore was described as "debilitating" migraines that would cause her "to stay in bed all day" coupled with an aversion to "light or sound."[194] If credited, that testimony is difficult to reconcile with the VE's conclusion.

During the hearing before the ALJ, the VE stated that a hypothetical individual of the claimant's age, education and work experience, and limited exertional level, who will miss work one to two times a week, would not be able to do Moore's past work.[195] The VE further testified that there was not any work in the economy that this hypothetical individual could do.[196] The VE reasoned that an individual must be able to work and cannot miss one or two days a week and

---

[189] *See* 20 C.F.R. 404.1520(c).
[190] 20 C.F.R. § 404.1520(c).
[191] *See* 20 C.F.R. § 404.1520(c) - (e) (if a claimant has a severe impairment that does not meet the listing requirements, it is up to the ALJ to determine whether any limitations exist).
[192] R. at 23.
[193] R. at 23.
[194] R. at 21 (reviewing Ms. Moore's testimony).
[195] R. at 71-2.
[196] R. at 72.

remain employed.[197] Yet the ALJ concluded that Ms. Moore is capable of performing past relevant work as a reservation agent, without mention of the VE's testimony.[198]

But our review of the ALJ's credibility analysis shows that she was not fully crediting Ms. Moore's claims of debilitating pain. Because of the lack of evidence demonstrating excessive sick leave in her previous job, she discredited Ms. Moore's claim that she stopped working due to sick leave.[199] Then she noted Ms. Moore's 2007 "implantation of bilateral occipital nerve stimulation" and that it provided significant improvement to her migraines according to the records (though it had required replacement of the battery, which was done in 2008).[200] And we have already reviewed the ALJ's determination that not all of her emergency room visits fully supported Ms. Moore's claim of debilitating pain due to the many notations that she was drug-seeking. Finally, the ALJ concluded by referencing the record evidence that Ms. Moore's treating doctor referred her to a pain specialist, yet she apparently did not follow-through or seek out further assistance with pain management.[201]

Here, the ALJ properly considered Ms. Moore's claims of pain, its duration and frequency, and the treatment she has received for her migraines.[202] She also considered the inconsistencies in the evidence and reviewed the conflicts between Ms. Moore's testimony and the rest of the evidence.[203] This is sufficient to find that the ALJ provided substantial evidence in support of her RFC determination that Ms. Moore could still perform her past work as a reservation agent, which is semi-skilled sedentary work.

## V.     Conclusion

---

[197] *Id.*
[198] R. at 24.
[199] R. at 23.
[200] R. at 21 (citing to R. at 391).
[201] R. at 22.
[202] *See* 20 C.F.R. 404. 1529 (listing requirements ALJ must consider).
[203] *See* 20 C.F.R. 404. 1529.

For the reasons outlined, Ms. Moore's motion for summary judgment is denied [dkt. 15].

**IT IS SO ORDERED.**

Date: May 7, 2013

Susan E. Cox
U.S. Magistrate Judge